Appellant Joaquin Molina et al. Mr. Volchok for the appellant, Mr. Dummy for the appellate. Thank you counsel for your patience. We've had a number of complicated cases today. Understood, your honors. Thank you for your time. May it please the court, Daniel Volchok for the Pan American Health Organization, especially appearing solely to contest jurisdiction and without waiving PAHO's privilege or immunities. May it please reserve two minutes for revote. I'd like to start by summarizing my arguments on both appellate jurisdiction and the merits. On jurisdiction, we submit that this case is controlled by the court's decision in Neamble and that even if Neamble had never been decided, there would be collateral order jurisdiction under Supreme Court and this court's precedent. On the merits, we submit there are two overarching flaws with the challenge order. First, the discovery rests largely on new theories of jurisdiction, theories that were not addressed in the prior appeal and that cannot support any discovery because as a matter of law, they cannot establish jurisdiction. Second, as to their one live theory of jurisdiction, their one non-new theory, plaintiffs have not shown as this court's that any discovery is necessary to resolve jurisdiction in the light of the information that PAHO has provided. So with that summary, let me turn back to jurisdiction. Neamble held that an order for jurisdictional discovery against an IOIA immune entity qualifies for collateral order appeal. A plaintiff's principal argument about Neamble is that it applies only when there has been a prior appeal in a litigation. But no case has read Neamble that way in the decades since it was decided. There's nothing in Neamble itself, the opinion, the reasoning to support such an artificial limitation. And such a limitation doesn't make sense because as I said, Neamble was about collateral order jurisdiction. So there was a very interesting amicus brief filed by these professors, William Dodge, Mark Feldman, and Edward Swain. And I wonder if you could address their argument about Neamble. They said that, you know, Neamble, so Neamble was about organizational immunity. And it held that a district's court's granted discovery against an absolutely immune defendant is sufficiently conclusive to qualify for collateral review. And the professors say in J.M. versus International Finance Court in 2019, after Neamble, the Supreme Court held that the IOIA confers the same immunity on international organizations as FSIA does to foreign governments and that international organizations are not absolutely immune from suits. So Neamble was based on a case that we had before J.M. that said that organizations are absolutely immune unless they waive their immunity. J.M. comes along and says, no, no, that's not true. They're not absolutely immune. So the professors say Neamble is based on law that's been overturned and overruled. It doesn't apply. You can't rely on it. So the last part is their assertion, Judge Pan, is not correct. So absolute immunity was the term of art that was used prior to J.M. to describe IOIA immunity. And as you indicated, even before J.M., it was something of a misnomer because IOIA immune defendants before J.M. were not absolutely immune. There was one statutory exception, express waiver. And it's certainly not correct, as I think the academic and Niki are suggesting, that J.M. was holding that a jurisdictional discovery order against an international organization qualifies for collateral order review only if the international organization is genuinely, truly immune. And the reason I say absolutely immune, the reason I say we know that can't be right is because in Neamble itself, this court rejected an argument from the international organization there, the IMF, saying that it was categorically immune from any jurisdictional discovery, could not be ordered under any circumstances. This court rejected that precisely on the ground that, no, you are not absolutely immune. You can be sued if there's an express waiver. So what J.M. was, excuse me, what Neamble was saying is, was that in order for jurisdictional discovery against an international, an immune international organization that has, I should say, an international organization that has immunity unless a statutory exception applies. There was one exception at the time of Neamble waiver. There are more now under J.M., the FSIA's exception. I guess waiver doesn't seem to be the same type of provision as the other ones that are contemplated. But to put it in context, before Neamble, with respect to sovereigns under the FSIA, we also had some other cases, I guess Beecham and Hirogi or something, anyway, that seemed to suggest that for jurisdictional discovery orders, that is not something that is subject to interlocutory appeal, but there is a safeguard for a really abusive one, which is mandamus. And so it seemed that Neamble came along and said, we're talking about organizational sovereign immunity, and it went off in this direction about absolute immunity. But then J.M. comes along and says, no, no, we're going to treat FSIA and IOIA the same. And now, why isn't it the case that Beecham and, I'm forgetting the name of the curve. Papadreou? Papadreou, thank you. Papadreou applies because now it's all the same thing. And now mandamus is your remedy. Otherwise, you don't get to appeal a jurisdictional discovery order. A couple of responses. In Beecham, there was not a jurisdictional discovery order at issue. It was an order telling the parties to come up with a discovery plan. And this court said that does not impose anything more than a de minimis burden, so you don't qualify for collateral order appeal. Neamble said the same thing in refusing to take interlocutory jurisdiction over the district court's denial of the IMF's motion to dismiss, because it was a motion to dismiss without prejudice based on a new complaint having been filed. And so this court said all that the IMF had to do there was refile a preexisting motion to dismiss, not enough of a burden to qualify for a collateral order jurisdiction. But Beecham did not involve that kind of order. Now, Papadreou did. Yeah, be that as it may, right? You're asking for a categorical rule that jurisdictional discovery is subject to this kind of interlocutory appeal. And Papadreou? Papadreou, yes. Papadreou and Beecham suggest that, no, no, if you want to do that, it's mandamus. And there's also the argument, like, this is a lot of, I mean, there's not, I guess, there aren't a ton of these jurisdictional discovery orders. But the idea is if we were to find that we'd have to distinguish Papadreou and Beecham, but also we'd have to find that there's some categorical reason why we should allow jurisdictional discovery orders to be immediately appealable. And there are a lot of reasons why we probably don't want to do that, that have been addressed by the district court and other parties about grinding this to a halt, giving you too many bites of the apple to appeal, et cetera. A couple of responses, if I may. First of all, we know it has to be categorical. The Supreme Court has told us that if cases are subject to collateral appeal, you do that on a category basis, not on an individual basis. So we submit that Neanderthal holds that jurisdictional discovery orders against IOIA immune organizations are a category of orders that qualify for collateral order appeal. On Beecham, you don't have to distinguish Beecham. Beecham is factually different. And I submit when you read Beecham, Judge Pan, I submit it's quite clear the court was saying, gee, if there had been actual discovery, that might be quite a different case. But here we don't have that. So no collateral order. Now, Papadreou, I think Papadreou is a great case for us. Papadreou makes absolutely clear that some type of appellate review, immediate appellate review, is necessary because of the seriousness. But that was mandamus, though. It was mandamus because, well, a mandamus petition was filed, and the amici suggest that if there had been, if collateral order jurisdiction had been available, this court could not have granted mandamus. The reason that's wrong is that no party in Papadreou, and I've looked at the six briefs from 1997, the petition, the response, the three-party briefs, and the U.S. amicus brief, none of those six briefs even mentions collateral order jurisdiction. And I don't mean mentions it only as a possible alternative remedy that would foreclose mandamus. They don't mention it at all. They don't cite Cohen versus Beecham. It assumes that there is no other alternative. It assumes that collateral order review isn't available because you wouldn't get mandamus if there were any other way to do it. Correct. But this court was not presented with the argument. It's a jurisdictional factor, though, that we would have had to consider on our own. No, because mandamus jurisdiction is not jurisdictional in that sense, save so long as the mandamus petition would be issued in aid of jurisdiction. So, this court dismisses mandamus petitions for lack of jurisdiction. It's because someone has sought mandamus to a court over which this court does not have an appeal. This court has said we can issue mandamus to protect our current... They have said that elements of mandamus are jurisdictional. I don't think that is correct, Judge Millett. I could be wrong, but this court has dismissed mandamus petitions only... But in any event, Your Honor, even if it's jurisdictional, the argument was not presented. So, whether or not this court... I'm trying to think of a warning no doubt illustrates. No doubt about it. And my point is no one raised it to this court. But I do want to get back to, we're not just relying on Neambul. I said at the outset that even if Neambul had never been decided, there would be collateral order jurisdiction. Look at the process and industrial development case decided five years after... Can we go back to, like, we all agree that if we're going to find jurisdiction, it would be a categorical thing under the collateral order doctrine. What are the big interests that make it so imperative that we relax the normal rule that you need to get to final judgment before we get here? That's presented by a jurisdictional discovery order. The interest that this court has recognized in foremost McKesson versus Iran, in Papandreou itself. That's about immunity itself. I'm talking about jurisdictional discovery about immunity. So, even in Papandreou, Your Honor, this court said, sovereign immunity is an immunity from trial and the attendant burdens of litigation. The infliction of those burdens may compromise it just as clearly as would an ultimate determination of liability. So, what this court has said in case... It's a sovereign immunity decision, but I'm talking about a discovery order to determine if there is sovereign immunity. But Papandreou said what... Does the courts have jurisdiction to determine jurisdiction? No doubt about it. And so, why? I don't understand. Separate sovereign immunity from discovery to determine. So, the language that I just read from Papandreou, Papandreou was obviously about a jurisdictional discovery order as we were discussing. So, what this court has recognized in Papandreou and elsewhere, the PNID case that I just mentioned, I'm happy to quote as well. That's on page 23 of our brief, 38 of the plaintiff's brief. This court has said, ordering jurisdictional discovery is a form of denial of the immunity, and it is a permissible form to the extent that the discovery is actually necessary to determine jurisdiction. This court said in Papandreou, in Neambul, in other cases, that jurisdiction, when there's a disputed fact about jurisdiction, courts can order discovery that is necessary. That is the word you see in Papandreou, foremost McKesson, Neambul, to order the discovery that is necessary to resolve jurisdiction. Now, we submit they haven't done that. That's a merits question. I hope to get to that in a few minutes. But the interest that justifies relaxing the final judgment rule is protecting the immunity that Congress conferred and the President conferred in the IOIA. It's the same interest that you see in cases like PNID, where this court granted collateral order. But doesn't your argument assume that there actually is immunity? That's the question that we're trying to determine? There is immunity until an exception has been established. And as you said, that's the question of jurisdiction. The court has jurisdiction to determine its own jurisdiction, so the federal courts can pursue the discovery that is necessary. You mentioned PNID. Am I right? Part of what was going on there was that the effect of the order was requiring the defendant to litigate parts of the merits before the immunity question was resolved. And the holding in that case is, well, you can't do that. And that, if you have an order that does that, requires litigation of the merits before immunity is resolved, you get an immediate appeal. Correct. I think the lesson of that would be, if this was an order that had jurisdictional and merits discovery, it would certainly follow sort of immediately that we would have appellate jurisdiction. But if you have an order like this one, that at least on its face is about jurisdictional discovery only, I understand you still have an argument based on the language that there is a sovereign interest in play. But you'd have to agree it's a lesser interest than requiring a potentially immune defendant to litigate the merits. What the court said in PNID was that imposing the burdens of litigation on a foreign sovereign is precisely what triggers the second and third factors of the collateral order doctrine. Now, that was merits there, Judge Garcia. But first of all, my submission is that the order here is significantly more burdensome, simply briefing the merits as opposed to all of the discovery that has been ordered. And we submit that the discovery here is, in fact, not limited to what is, that is our entire merits argument, the discovery is not limited to what would be appropriate to resolve jurisdiction. That's the very reason we say under Neambul, under PNID, Poppendrae, Formos-McKesson, et cetera, there is collateral order jurisdiction. Now, as I said, or I'm sorry, Judge Pan, as your question alluded to, there is this argument that you hear from plaintiffs and the academic amici that if there is appellate jurisdiction here, defendants may be able to drag out cases like this for many years with interlocutory appeal after interlocutory appeal. A couple of responses on that. Number one, as our reply brief points out, the Supreme Court rejected much the same argument in the Coinbase case, explaining that courts have robust tools with which to prevent litigants from dragging out litigation with frivolous interlocutory appeals. And one point I think is important that follows from that, Yars. Yars, thank you. What tool that we can apply to 4 and 7? So to prevent frivolous interlocutory appeals, the court talked about a district court certifying an appeal as frivolous. What I was about to say is that plaintiffs have not, in this case, did not ask the district court to do that. There's a categorical rule under Mohawk. So categorical rules have been meritorious and frivolous. I do not understand the Supreme Court's precedent, including cases like Coinbase, to say that even if there is jurisdiction, because the fact that there's collateral order jurisdiction, just like the fact that there's ordinary appellate jurisdiction after a final judgment, does not prevent a district court from certifying an appeal as frivolous, a court of appeals from dismissing an appeal as frivolous. I mean, this is- I've never heard of that. There are courts that certify appeals as frivolous? Yes. Yes. I mean, this is exactly what the Supreme Court said two years ago in the coin- District court, do it. I'm sorry? I'm sorry. I didn't hear your question. They do. They just sort of say, you filed this notice of appeal. I think it's frivolous. Yes. I am prepared. I am certifying this appeal as frivolous. Now, of course, it is then up to the court of appeals to- Find it to us? I'm sorry? I think the implication is certifying it to the court of appeals. It is- I mean, I can't do better than cite this case to Coinbase from two years ago, which also involved interlocutory appeals, right? That was- Frivolous, but guess what? Everyone has to go through the appeal process. There's delay, there's briefing, there's expense. Correct. Well, what the Supreme Court also said, you asked me about the tools that the Coinbase court identified certifying an appeal as frivolous. It's just one of them. Supreme Court in Coinbase also talked about summary affirmance. This court can dispose of appeals without full merits briefing and oral argument. Sanctions as a possibility for litigants who are- Can we impose monetary sanctions on a foreign sovereign when the question of immunity is still open? So I was answering the court's question about what tools the Coinbase court- In this situation, when we're dealing with foreign sovereigns- Yes, I believe- Without even deciding whether they're subject to the jurisdiction of the court, do we impose what? Damages sanctions? I don't think it would be a damages sanctions because there would be no showing of damages, but it would be for litigation conduct. This court- Litigation costs is a damage. That's a- Okay, sorry. Litigation costs, attorney's fees, that sort of thing. Yeah, I think that- Or conceding that that can be done to a foreign sovereign? I'm sorry. I may have misunderstood your question. I'm saying that is what the Supreme Court identified as one of many tools that- Did the Supreme Court say it was applicable to a foreign sovereign? No, because it was not dealing with a foreign sovereign immunity case, but- That's why I think you're getting this question from me and Judge Pan. So if you're willing to concede- I don't know how you can concede this. I can't concede that on behalf of any international- Certainly, I couldn't do it beyond PAHO, but I don't think I can even do it on PAHO's behalf. Yes, concede to your clients that if, say, we said an appeal was frivolous, pay court fees to this court and to the opposing counsel, write them a check for, or a venmo for some large amount of attorney's fees. Enforceable or not? I don't know that that would be enforceable, Judge Millett. This doesn't sound like much of a protection against illicit people. It's a very important protection, Judge Millett. This court has- Completely unenforceable and unenforceable- I don't know if it's enforceable or not, Judge Millett. You don't know that it is? I do know that- Wait, time out. You just said you don't know if it is enforceable, correct? I agree with that. How can you tell me it's a relevant, helpful limitation on frivolous appeals when you can't even tell me if there's anything remotely enforceable we could do to rid ourselves of frivolous appeals? Judge Millett, I was answering your question about what tools the Supreme Court identified in the Coinbase case. Our question was what tools could be applied in this context. Okay, well, the district court certifying the appeal as frivolous, this court summarily dismissing the appeal, and plaintiffs did not ask this court or the district court to do either of those things. In Coinbase- To me, the things that you're referring to are just not realistic. We get lots of appeals that some might think are frivolous, but I have never seen a district court judge certify an appeal as frivolous. You're asking a judge to opine like that. I guess I'm going to apply a motion for a frivolous certification, which I've never seen. Then you're saying it would come up here and we could sanction somebody for filing a frivolous appeal. I don't think we've ever done that. We might say we haven't done money damages, but sometimes we would say you can't file another one unless you get some prolific person litigators. Let's say you need to get permission before you file again or something like that, but monetary damages for filing frivolous appeals? None of this sounds realistic to me. So I am drawing all of this directly from the majority of Supreme Court decisions- If we could just maybe reason from first principles for us in a situation involving foreign sovereigns, what is a limitation other than us having to go through summary affirmance, which for comedy reasons is not something we commonly give in foreign sovereign cases? If you want us now to treat them the same as repeat litigants, let me know. So there are always burdens and delays that accompany a ruling that a class of orders is subject to collateral order appeal. There would be in this circumstance, but Neill held that that class is available. Now, my second response on this argument about- I don't want to talk about class or categorical decisions at all. It decided the case in the context in which there had been no ruling yet at all on the merits of a motion to dismiss on immunity grounds. And that is exactly what we have as to most of the discovery here, because most of the discovery here is based on new theories of jurisdiction, as I articulated at the outset. As to all of those theories, which I'm happy to discuss with the court's indulgence, all of the discovery that rests on those theories- I just want to make sure if Judge Panton wants to ask any more about if there is anything remotely realistic that could be done to prevent a foreign nation from appealing every discovery order. Well, we certainly know that in the decades since Neambul was decided, and in the many more years that there have been cases under the FSIA, there has been no flood of jurisdictional- of abuse of appeals like this. In fact, what the academic amici point to two examples of what they say are litigations that have gone on too long against foreign sovereigns because of interlocutory appeals. So the Simon versus Republican Hungary, the Helmer campaign litigation, both in this circuit. What they overlook is that in both of those litigations, lower courts interpreted foreign sovereign immunity too narrowly, and it was only because of the availability of interlocutory appeal that this court and or the Supreme Court was able to correct those misreadings and avoid foreign sovereigns being subjected to excessive litigation burdens, which goes directly to my second point responding to this argument about interminable interlocutory appeals. The second point is plaintiffs and their amici are ignoring the other side of the balance. As I said, whenever a class of orders is recognized as satisfying collateral order jurisdiction, there's delay, there's some risk of this abuse, but it is accepted in light of the orders, the values on the other side. When foreign sovereigns and international organizations are subjected to excessive litigation burdens, which is what will happen more and more if interlocutory appeal is denied in circumstances like this, that is harm to the public because all the resources that the international organizations have to invest is not available to serve their public serving functions. You're talking here about like this case, so I want to clarify one thing. When you talk about the one life theory of a jurisdiction for which they are allowed to get discovery, you're talking about the claim that was recognized by this court in the Farrar-Rodriguez appeal about transfers of money for a fee. Correct. Allegedly moving money for a fee between... If a district court says, I think here is, this is an additional relevant question to jurisdiction, is that sufficient? Does that make it, is it then permissible? Or are you saying that the only discovery that can be allowed is whatever theory is first, one single theory that is recognized in the appeal? Well, it is, our position is the latter, that you can get jurisdictional discovery only on a theory that has been held to be facially viable, assuming a facial motion. By whom? District court or court of appeals? Well, the district court, if a facial motion is dismissed is filed, an appeal, sorry, the appellate court, if an appeal is filed, obviously if no appeal is filed, none of this comes into play, but I do want to underscore two points. Before you underscore points, I got to get my confusion straightened out here. So in this case, we have the facial appeal and we recognize the theory. You want to call it the one single formulation of it. There are actually multiple formulations of it in that opinion. And as discussed at oral argument, I think it was you or the counsel for Pan-American had a much broader reading of it at oral argument. But in this case, went back to the district court and you filed a second motion to dismiss. Yes. You called it a factual motion to dismiss. So my first question is, if we're concerned about abuses, why didn't you file both at the same time? The factual motion to dismiss was required, imposed substantially more burdens on PAHO because it required PAHO. Well, it's anything you tell us in your brief, you voluntarily turned over these documents. And so you could have voluntarily, it didn't take any more work to voluntarily turn those over after our court, our ruling rather than it could have before. And then you could have done one appeal to this court. Right. But if you, what happened procedurally here is what has our radar up on, you know, seriatim 12B1, appeal after appeal, after appeal. So you got, you could have done that voluntary disclosure beforehand and then filed in a single motion, your facial and factual motion to dismiss. Could you, couldn't you? Yes, but we did because that would have required us to incur the burden. And if this court had agreed with us on our facial motion to dismiss, then this litigation. Now they have to incur the burden and we have to incur the burden of appeal number two, raising 12B1 motion to dismiss. So plaintiffs have not, to my understanding, raised any objection to the possibility of a facial motion to dismiss, followed by a factual motion to dismiss. Are you aware of that ever happening? I can't find another case where two 12B1 motions were split like this. In the DeCepel case that is cited in our reply brief and in plaintiff's brief. So D-E space C-S. I don't know what that case is. It was a case involving, the allegations were expropriation of artwork and breach of contract involving Hungary and World War II, expropriation of artwork. Hungary was sued. Case first came up on a facial motion to dismiss, went back down. Then a factual motion to dismiss after discovery was filed. After discovery. So that was that sort of summary judgment after discovery. It was, sorry, I apologize. It went up on a facial motion to dismiss. It went back, back down for jurisdictional discovery. And then at the conclusion, so not merits discovery and not summary judgment. Conclusion of jurisdictional discovery. Correct. And so my assumption... It's before. Your factual motion to dismiss is before any discovery and your whole rationale is that they don't get any discovery because look at all these documents we gave you. They get... So I'm going to ask again, has there been a case where it comes up on a facial one and we say, here is under 12B1 standards, a legally viable theory for having jurisdiction in the case for abrogating the sovereign immunity under 12B1 standards, thing could change. Go back, have jurisdictional discovery. And then you jump in and say, hang on, hang on. No jurisdictional discovery. We just turned over a whole bunch of documents. And on the basis of those documents that we have selected ourselves, we're going to file another 12B1. That's what I'm asking you. So all of the parties and the district court have agreed there does not appear to be a case exactly like this one. The closest is probably Neamble because as I said earlier... That's not like this at all. It's very much like this case judgment. Very much unlike it because there you did not have already one appeal, one legal determination, both by the district court and this court as to a viable theory for jurisdiction. And if they were only seeking discovery on that one viable theory, then I would understand why Neamble is... That's my... Okay. So why, given that you have filed a factual motion to dismiss and given our decision in Angola, Phoenix Consulting versus Angola, which says when a factual motion dismiss is filed, the district court cannot rely on just the allegations of complaint. There has to be discovery allowed for the plaintiffs to respond to that factual motion to dismiss that, and then the court will decide the factual motion to dismiss after jurisdictional discovery on the factual motion to dismiss. But what this court has said in case after case, I do believe it is in Phoenix Consulting, but it certainly is in cases both before and after it, like foremost McKesson, Papandreou, and Neamble. I want you to answer my question about the language from Angola. The holding in Angola, in Phoenix Consulting, was that when a factual motion to dismiss is filed... It must give... I'm on page 40. It must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction on the factual motion to dismiss grounds. Yes. And this court has made clear that what... First of all, it's made clear in Papandreou that, in fact, relevance is not the standard. That's not enough in the IOIA context. And it has made clear, as you would expect, that what plaintiffs are entitled to, what a plaintiff in this circumstance is entitled to, is the discovery that is necessary to resolve the jurisdictional dispute. And, Judge Millett, to your question, we say they don't get any discovery. The reason we say they don't get any discovery, even on what we call their one live theory, the moving money for a fee theory, is because they have not, we submit, satisfied Neamble's standard, which it drew from the Second Circuit. Fifth Circuit has said the exactly the same thing, that you get discovery that is necessary to verify specific allegations of facts. The court found it necessary here. What I'm asking is, you have argued here that the only thing they can get jurisdictional discovery on is the one theory that came up to this court. Correct. When, in fact, we have said that when you file a jurisdictional motion to dismiss on factual grounds, a factual motion, the court has to give them jurisdictional discovery that is responsive to that motion to dismiss. And nowhere in your briefs have you argued that the jurisdictional discovery here exceeds the bounds of issues raised in your factual motion to dismiss. You argue only that it exceeds the payment for a fee, the one little abbreviated line for a prior appeal you want to use. That's all you've argued. And you keep talking about the one live theory, the one live theory. But in fact, your jurisdictional, your factual motion to dismiss raises other issues. And as long as the district court's jurisdictional discovery doesn't go beyond what is necessary to respond to your jurisdictional motion to dismiss, which you haven't argued it is, they have to get it. Our factual motion to dismiss absolutely did not go beyond the one live theory. That is something the district court here said and explained why the discovery it allowed, including the stuff about the operations of administration of the program, was tied to your factual motion to dismiss. You have not argued about that. All you've argued about is the one live theory from the prior opinion. So you have forfeited those arguments. Excuse me, you're asking us to, I know you're going to disagree, so I'm going to finish it. You're asking us to say this discovery, I don't know if you even mentioned your factual motion dismiss in your opening brief, but your argument here is that discovery has to be tied to the, what you call the one live theory recognized in our appeal. And that all the discovery here doesn't fit that one live theory about the fee for transfer of money. But the district court explained why it was necessary to respond to your factual motion to dismiss on jurisdictional grounds. I don't think the district court did explain that, Judge Millett. Where have you argued in your brief, in your opening brief, that the district court's explanation for why the connection between the discovery it allowed and your factual motion to dismiss doesn't exist, as opposed to what we said in our opinion last time? For example, pages 37 to 39, we walked through significant proportions of the jurisdictional discovery requests and explained why granting jurisdictional discovery on each of those was impermissible. Some of those... And you say impermissible because it wasn't the one live theory. That is some of it, Your Honor. That is not the entirety of it. We get to discussing the one live theory... Where do you discuss your factual motion to dismiss here and the content of it, the information you provided, the arguments you made? Where is that discussed in here? Well, we discussed it certainly in the procedural history section, where we are discussing how we got to this point. But we discussed the errors to the extent the discovery rests on the one live theory. We discussed those errors starting at page 47 of our brief and going all the way to page 57. Now, I don't want to skip over the fact that we challenge a lot of the discovery as going beyond the theory, principally resting on the theory that the administration of the Mace-Medicos program was carried on in D.C. The district court said that on JA 1241, and that was the entirety of the court's explanation for five of the 13 jurisdictional discovery requests. Now, this court held in the Youngquist case, J-U-N-G-Q-U-I-S-T, this court held, quote, administering a national public health program is a non-commercial activity, end quote. That is a quote from plaintiff's brief to this court in the prior appeal at the top of page 32. They said, and the Youngquist did in fact hold, administering a public health program is a non-commercial activity. The United States said the same thing to this court in the prior appeal on page 25 of its brief. The Second Circuit held the same in the Anglo-Iberia case that we cite. So even if PAHO administered Mace-Medicos from D.C., that is a matter of law under Youngquist. The other authorities I just cited would not be a commercial activity, could not establish jurisdiction. And the district court agreed on JA 1239 that if a theory can't establish jurisdiction, it necessarily can't justify any jurisdictional discovery. Now, we made this point about administration of a public health program at some length in our opening brief, as our reply points out. Plaintiffs do not answer it at all. They don't cite Youngquist. They don't cite Anglo-Iberia. They don't cite the United States' amicus brief. So with this point having been conceded, and with this being the... Hang on. You just admitted that your factual motion to assist to this raises the issue of how the program was administered. No, it does not. They are seeking discovery on those things, Judge Millett. We put... You said it was all administered from... I'm sorry? You just said that it was all administered. You introduced documents to show what you were doing under this program, and what you were not doing, and where you were doing it. We introduced documents to answer the one theory that this court held facially stated a claim, assuming the truth of plaintiffs' factual allegations in the complaint. Moving money for a fee between Cuba and Brazil. So we provided contracts between Brazil and Cuba... Excuse me, Brazil and PAHO, PAHO and Cuba, including agreements showing the exact amount that PAHO was paid by Brazil in connection with Mace Medicus. We submitted... We provided bank statements. Here's what I see, counsel. I mean, you have a perspective and a position on what's relevant and what's not based on your reading of the prior opinion by the circuit court, and you litigated in the district court accordingly. District court disagreed with you. And just one example of this that kind of struck me was that you take the position that, oh, we've given you all this banking information about where all the money we got from this program and went to our Banco de Brazil account, and then it went out to these different areas, to Cuba, et cetera. And then there was this 5% fee. You don't talk about where the 5% fee went because you say that's not moving money for a fee. That went to our administrative expenses. That's the kind of thing that we do to pay for our administrative expenses. But the point is, neither the opposing side nor the district court has to accept your representations about that 5%. They can say, that's evidence of moving money for a fee. That's the allegation. So we want discovery about where that 5% go. And part of that might include, logically, all the money that came in from ICE, Medicos, where did that all go? Because that could be part of nailing down where that 5% go to, because they might not agree with you that that 5% is not moving money for a fee, you see. And the problem is, every time they disagree with you, you're saying, you get to come up here and appeal. And that seems untenable to me. Anything that's related to your immunity, you think you can come up here and appeal. This is jurisdictional discovery. There's a lot more that has to happen. What if we disagree with you, send it back, and you have another dispute about it? Are you going to come up here again? So Judge Pan, several responses. We did provide information to plaintiffs about where the retained funds, the 5%, was moved after it was recognized by PAHO. So Brazil deposited into one account in the country of Brazil. Our declaration explains that once PAHO recognized 5% associated with a particular direct cost, deemed itself that money to have been accrued, our declaration explains, it's in the record, that it was moved to another account in Brazil. So factually, we have addressed it. Now, to the point- Thank you, but it never comes to America. You don't want to say. They have no- We believe that under Neambul, Neambul says- I understand that's what you believe, but that's-  My whole point is, you could be wrong. The district court could disagree with you. The other side might want to test your theory. The point is, you could be wrong, and you shouldn't be able to run up here and complain to us every time somebody disagrees with you on a jurisdictional discovery issue. Neambul squarely holds that jurisdictional discovery against an IOIA immune entity is available only if the plaintiff can make a specific, well-founded allegation that- I understand that, and there's a dispute between you and the other side about what that specific, well-founded allegation is, and you think that you should be able to appeal every time that is disagreed with by the district court, and I think that's untenable, because even just on the facts of this case, it seems to me that what the district court did, a completely normal discovery to allow the other side to test the allegations that you've made, which they're entitled to do, but that's been cut short because you decided to take an interlocutory appeal, and I have no confidence that if we send this back, because we also disagree with you, you might find another thing that you want to appeal to us. They are not entitled to that information under Neambul, McKesson, Apadreou- According to you. That's your position. They get to test it. They get to get discovery and make their case as to why you are wrong. My position is that under binding precedent, under this court's cases that I just recited, they do not get that unless they can make a specific, well-founded allegation. And maybe the district court thought they did. It did not. And maybe they did. For those responding to factual motions to dismiss that discovery in those cases, you said? Yes, I believe. I am not sure of the answer to that question, Judge Millett, but it certainly all involved jurisdictional discovery. That's a very different thing. So what I'm saying, we have a case that says when a factual motion to dismiss is filed, the district court must allow responsive jurisdictional discovery for them to test, counter, to be in a position to counter or not. They could send up the white flag. Those theories propounded there. And so we haven't, even for sovereigns, we have an adversarial system of justice. We don't let one party come in and go, here are the records I choose to give you, rule on this district court. That is correct. Do you agree that the district court under FANIX Consulting had to allow responsive discovery necessary for the court to be able to decide your factual motion to dismiss? Do you agree with that? Yes, because you said necessary to resolve a factual motion. Fine, I'll use the word necessary all day if that's what you want. Yes, and I do agree. Okay. All right. And where did you argue that, given the things that you raised, where you talk about the 5% fee and what it was for, you talk about administration, what occurred in the U.S., what didn't occur in the U.S., where did you argue that that was invalid? Because when the district court said, I'm allowing that to respond to the factual motion to dismiss, and all I read in your brief was that's not consistent with their affirmative argument, their affirmative argument for jurisdiction on the prior appeal. I didn't say that. You cited those pages, but I think those are all talking, as I read them, in terms of your rationale for the one live theory. 47. The live theory. Yes, the one live, sorry. There's two live theories. There's a live theory that they affirmatively raised, and now there are live jurisdictional issues that you have raised that are factual issues, not legal issues. We have not raised any new jurisdictional issues in our factual motion to dismiss. As I said, we provided the information, responding to the one theory that the district court and then this court held. Well, you added discussions about where it was administered. You added discussions about the fee and what it was used for. You want to say it's program support costs. Right. They want to say it wasn't used at that. That is the dispute. Do they get to say that you're wrong, that was not a program support cost? But they get to say... Do they get to make that argument? Sure, that's a legal argument. Do they have discovery to allow them to make that argument? Only if they can make a dispute. Do they get to have discovery to counter the argument that you have relied on to say why there is no jurisdiction? No under Neambul, unless they make a specific... I'm just telling you. What more do they have to say? Neambul did not involve a case where the defendant had come forward and said, here are factual questions that provide a basis, your resolution of these factual questions. And neither did we. You filed a factual motion to dismiss. Look at these facts. These records... Please, just let me get that. Sorry. I don't need affirmation. No, I appreciate that. All right. You filed a factual, a non-legal motion to dismiss. A factual one says, here are facts now. We had our trip up on law. Here are facts. And under these facts, you must now dismiss this case because it shows that what we did does not count as commercial activity. We had a 5% fee. That's a program support cost. We didn't administer anything here in the US that was beyond ordinary sovereign entity types of administration. They... District Court has to give them discovery under our decision. Cannot rule on your motion until it gives them discovery. They say, it is necessary for us to contest. And the District Court said, it's necessary for them to contest in a way that will allow me to make a reasonable ruling. They need to get information about that money trail. They need to get information about what was administered where. My fundamental submission is that we put forth in our factual motion to dismiss evidence showing that the factual allegations on which this court and the District Court relied in the first appeal, the District Court prior to the first appeal, to conclude that they have a legally sufficient claim, that those critical factual allegations were false. Were they supposed to have... Okay. Because you provided documents, but imagine you have a different, far less scrupulous foreign country that comes and forwards and comes out with a company, country X. It's word and says, here's the contract. It doesn't say anything. Here are the documents about the bank accounts. They show where the money went. None of it can touch the United States. Here are the papers that show what we were doing and where. And they're all fabricated. District Court, get to give discovery. Unless if they can make a well-founded allegation, they have not. They have absolute... They don't even get to test. Plaintiffs have not come forward with any specific facts that they say are crucial to the immunity determination, let alone explain why any of the discovery that they sought or that was ordered is crucial to verify those facts. That is our submission. That is exactly what Neambul and other cases require. Your argument is premised on everybody accepting that you're correct on your legal theory about what this court previously held and what facts are relevant to that. And this is an adversary system. The other side gets to test your theory. The other side gets to oppose your theory. I just don't understand why you think that you get to win because you believe in your theory so much. I'm sorry. I want to make sure I understand Judge Pan because when we're talking about the theory, it's plaintiff's theory. Put it this way. Our decision in Rodriguez 1 formulated the theory in a couple of different ways. And you keep calling it the one theory. And I understand your understanding of the one theory to be that it has to go through the Washington, D.C., bank account. But our opinion also said, we believe that the physicians have sufficiently alleged that path of conduct of moving money for a fee constituted commercial activity carried out in the United States. So there are some general formulations of the same theory in the same opinion. And I think it's up for perhaps debate or discussion or a ruling by the district court about what, how much of this is relevant, how much of it should be subject to discovery, et cetera. But I think that procedurally, and as Judge Millett is trying to home in on, you have put facts before the district court that you think are relevant to your theory and you think that that should be the end of the story. But the district court has a duty and obligation to allow the other side to test your theory and to test your facts. And they might have a theory that comports with other statements in our prior opinion that there was commercial activity carried out in the United States, even if it didn't go through a specific Washington, D.C., bank account. One of the questions they will ask is, did this go through a different bank account, not in Washington, D.C.? These all seem to be very relevant to the opinion that we issued and the issues before the court and the facts that you put before the district court. So all of this seems to be relevant, and it all seems to be very sort of routine stuff that a district court does to establish whether there's jurisdiction or not. It conducts some discovery, it makes some rulings, and it's all in the context of a And we've already said, yes, there's a viable jurisdictional discovery ground here and a viable theory of jurisdiction. And I just am puzzled by you coming in here and insisting that you must be right and everybody has to accept just what evidence you think and your view of what our prior ruling said, and therefore you win. That is not consistent with the way an appeal works or litigation for the district court works. Two responses, if I may. It is unquestionably a foundational component of our overall submission that jurisdictional discovery involving an FSIA immune or IOI immune entity is fundamentally different than ordinary discovery in civil litigation. This is the point the court has made about the imperative of not infringing on the immunity that Congress has granted any more than necessary. That's why I keep coming back to the word necessary. My second point is that, Judge Pan, even on remand, JA 1238, the district court rearticulated the theory that it held and that this court affirmed and it talked about carried on in the United States in as much, I'm quoting now, it was allegedly carried on in the United States in as much as the full sum of money, the money to be moved along with PAHO's fee, was placed in a U.S. Citibank account as a layover on its journey to its final destination, Cuba. Right. So why don't you have to give the discovery where they're asking what other U.S. bank accounts have you used? Has this money gone into U.S. bank accounts, et cetera? How do you think that that's not? Just as in Neambul, where the IMF turned over the relevant contracts, the plaintiff still, Mr. Neambul, still had arguments about how there might have been an express waiver, and this court said not enough. You were just speculating. It's not enough to just come in and say we think this evidence is false. They don't have a well-founded- They have documents that support their theory of the case. That would be different than Neambul. If they could make a specific well- I'm not asking you to restate the legal rule. I'm asking you if they actually have documentary evidence. Not that they do, but if they had documentary evidence that countered a characterization asserted in your factual motion to dismiss, that would be different from Neambul, which was sort of pure speculation, as I think we described. Well, the plaintiff- Yes, that would be different. Well, yes, it doesn't matter, but no, because- Sorry. It doesn't matter, but no. So it's not different. Mr. Neambul came forward with documentary evidence that we call pure speculation. Well, he kept pointing to language in the relevant contracts that he said were sufficient to suggest that there had been an express waiver somewhere. IMF came forward with the actual contracts and the declarations saying there is no express waiver. It's a legal question what a contract means. It's a legal question. I agree. It's a legal question what a contract means. We have come forward with the evidence showing- I do want to emphasize, we showed exactly how much- with contracts that long predated this litigation. Contracts between Brazil and PAHO showing how much Brazil would pay PAHO in connection with Mace Medicus. We provided bank statements showing transactions from Brazil to PAHO in Brazil corresponding to those exact amounts, and we provided declarations explaining that what we have provided is the entirety of the relevant payments. Now, yes, if they had some basis to nonetheless say that's false, that's phony, and they could satisfy Neambul's standard, which is what I keep coming back to- false or phony would be great for them. But also, hang on, you said relevant documents. There's, in fact, other arguments that are- there are other documents that are relevant. So we know- There's some we need to check more for their discovery. We have to come up- is your position that plaintiffs have to come up with everything that they need to counter your factual motion dismissed on their own without discovery? My position is that Neambul holds- Now, give me a yes or no answer to this question. Is your position that to meet the standard, you want to try to quote to me again from Neambul, they have to come forward, they have to have the evidence already themselves? Yes, they do not get discovery. They do not get jurisdictional discovery. What will they ever need discovery for? I'm sorry? What will they ever need the discovery for? Well, if they have enough evidence that they've gotten on their own to create what court concludes, and the district court did not say this, did not say they have made a specific allegation, a well-founded allegation. Actually, the district court did say that, and I'm happy to address why that's not right. Well-founded allegation that any of the discovery they sought or that was ordered is necessary to resolve facts crucial to the immunity determination. I keep coming back to this court's case law. This is what we understand this court to have required. Unless the court has further questions, I'll save my two minutes for a poll. Thank you, counsel. I'm sorry, is it Devin or Duman? Devin, sorry. Thank you very much. May it please the court, I'm Sam Duman representing the plaintiffs, Ramona Matos, Tatiana Cabarla, Fidel Cruz, and Rosella Rivera. This court should dismiss PAHO's appeal because it is not an appealable interlocutory order, and if the court does entertain the appeal, it should affirm the district court's narrow and proper jurisdictional discovery order. On the subject of appealability, Judge Postberg's discovery order is no different than any other discovery order. It's a non-final order, not subject to interlocutory appeal. Categorical rule that PAHO is urging here, its theory would basically give every sovereign or international organization three nights to appellate Apple categorically, as the court pointed out in its questions. It could file a legal motion to dismiss and lose, raise factual issues, object and appeal discovery orders, which, as the court pointed out, are required under Phoenix. And then, once the judge takes that evidence and decides once again that they're not immune, get to appeal that decision. That's their position. That's untenable. It's contrary to everything this court and the Supreme Court has said about interlocutory appeals. The reliance on the AML is not viable for two reasons. Number one, this court's prior rejection of PAHO's legal immunity argument. And number two, the Supreme Court's jammed decision, holding that international organizations like PAHO are not absolutely immune, but are indeed subject to all of the immunity exceptions of the FSA. All it did was expand the list of exceptions to immunity. All JAM did was expand the list of exceptions to immunity. That doesn't really undercut NAMBOL's reasoning. Well, the application of NAMBOL was very clear. There was only one avenue of- I know, but I don't understand that JAM abrogates NAMBOL in any way. I think that's binding precedent on us. It's just that you have a longer list now of exceptions than you had then. Agreed. One, now you have all the FSA ones. Agreed. I didn't say it abrogated NAMBOL. I'm saying that it renders NAMBOL inapplicable on the question of interlocutory appeal. Another feature of NAMBOL, it doesn't say a whole lot, but everything it does say is followed by a citation to a case construing the FSIA. So if we were just to say, what did we- did we think- maybe this isn't the question, but if you were to read this and ask, did this panel think it was articulating a rule that would govern in an FSIA case, and all JAM really held now is IOIA cases or FSIA cases, sure looks like NAMBOL was just relying on principles we've already articulated in FSIA cases. How would you respond to that? I think NAMBOL was correct in the sense that there was no other avenue other than waiver, which was, as Judge Boasberg agreed, was categorically precluded by the evidence that was presented in that case. And there had been no prior determination. The appealability determination, it's one paragraph, and all we cited were FSIA cases. So to say we're not bound, I just- how do you- in explaining why we're not bound by NAMBOL. Okay, if you don't mind, I will answer your question if I can go through the points that I- the answer is that under JAM and under, you know, your decision in 2022, there are many, many more avenues to overcoming the jurisdictional objections than the one waiver issue that was available in NAMBOL, which was categorically precluded, and the court articulated what those were. In this case, the threshold immunity determination was previously decided adversely to PAHO, and they made all the same arguments, by the way, that Mr. Volchuk was making to you now about that these- that this money is sovereign, you know, the U.S. government's brief. That was all rejected by this court. So the burden to PAHO of litigating in federal court that was the essential wrong of NAMBOL has already been overcome because this court held that their legal objection is invalid. That's a major difference, and that has nothing to do with JAM. JAM has- raises a separate issue, which is the scope of possible issues, you know, that can be raised by a plaintiff, you know, to overcome immunity. And on that score, you know, NAMBOL clearly says that absolutely immune defendants, you know, are subject- can appeal it when their immunity argument had not been addressed, and it had not been addressed, and that's a key point. So today, you know, there are now multiple, more fact-intensive paths to jurisdiction, which this court identified in its 2020 decision, and which Judge Boasberg identified in his discovery order. That wasn't the case in NAMBOL. The fact-intensive nature of the current jurisdiction is illustrated by- judged by this court's 2022 ruling, which you held, the financial benefit that violates 1589b is itself wrongful conduct and occurred in the United States to wed PAHO, receive, forward, and retain Demis Medicus money through its Washington, D.C., bank account. Accordingly, we believe that the physicians have adequately- have sufficiently alleged that PAHO's conduct of moving money for a fee constituted commercial activity carried on in the United States. In other words, the prior ruling by this court against PAHO's immunity and JAM worked together to eliminate NAMBOL's applicability on the issue of appellate jurisdiction here. The court's prior rejection of PAHO's legal immunity argument means that it's Judge Boasberg's discovery order- that Judge Boasberg's discovery order, unlike the order in NAMBOL, is not the reason PAHO will be subjected to litigation when it claims immunity. That's the result of this court's thorough decision in 2022, opening the door to these many avenues of overcoming- Some of the discovery you sought, this report understood to be advancing a new jurisdictional theory under the second prong of the commercial exception, an act performed in the U.S. in connection with foreign activity. I'm sorry, I didn't hear your question, Judge Mohawk. This report said that some of the discovery you sought was, in fact, trying a new jurisdictional theory out, an act performed in the United States in connection with a commercial activity of the foreign state elsewhere. And he rejected that, denied that discovery. He specifically said that all of his orders were based upon the carried-on theory, not the direct effect theory. I understand. You had sought broader discovery than that. Well, there was a long, almost a two-year process. You had sought discovery under both prongs one and prong two. Is that correct or incorrect? District Court said you sought it under both prongs. We made the argument. Okay. Sure, yes, we did. So, if the District Court had, in fact, allowed discovery on the second theory, an act outside the territory of the U.S. I'm sorry, an act performed in the U.S. for commercial activity conducted elsewhere. He could have done that. No, because this court held in the ExxonMobil case that the parties are not limited to just one theory under the FSIA to overcome the jurisdictional objection. I understand, but they just objected and said, hang on, hang on, hang on. Nobody has ruled that that is a legally valid theory in this case. Your Honor, it's not on the table. They could challenge that. Respectfully, that's a theoretical question. Judge Boothbrook said that every single one of his— I need to ask theoretical questions because we have to write opinions that go with not just this case but other cases. And so, you know, you're objecting that they got their one appeal done and dusted, let's have discovery. But if, in fact, the discovery goes to a different jurisdictional theory, what answer then? It doesn't. I'll go through each one of the orders, Your Honor. I'm not asking that. I'm asking you a legal question. If, in fact, discovery were granted on both prongs one and prong two, could they then appeal at least the discovery on prong two? I would say no, because— And then that seems you're exactly in the Neambul case. No, because the problem with Neambul was that they were going to be subjected to any litigation before their legal immunity argument was resolved. That simply doesn't exist here. Yeah, but they have a whole other legal immunity argument now. No, they've got to go to court. They've got to defend this case. And that's what this court's precedents say— You could raise six new jurisdictional theory. You could invoke every exception there is under the MSIA and throw in a waiver argument as well, and all of that would be open to discovery without them being able to say, hang on, none of those are legally viable? Well, again, that's not this case, Your Honor, but I would say— I am acutely aware that's not this case. I'm trying to understand, if we have to write an opinion on this jurisdictional question, how do we navigate this concern that Neambul recognizes, that you've got to stick to the legal theory that's been sustained? Your Honor, Neambul did not, did not, as this court did, not involve a situation where the defendant's overall conduct that they claimed was immune, legally immune, because it was sovereign and not commercial. That's the issue they raised. That's what this court decided, that because we're an international organization doing healthcare, money we take from Brazil is sovereign. And they cite the Youngquist case, and they cited the U.S. government's brief that said, you know, these international organizations, everything's sovereign. Well, Judge Boasberg rejected that, and this court rejected that, because what they did was committed a crime under the Trafficking Victims Protection Act by benefiting from participation in a human trafficking operation. They committed a crime. I beg your pardon? We did not say they committed a crime. That's your characterization. They violated a criminal statute with civil remedies, Your Honor. That is your argument. We're talking about—we upheld one theory. We send it back. And if the discovery starts flopping over into a different jurisdictional theory— It doesn't— —we wouldn't get to appeal that. Again, our position is it does not violate the rule. There are two issues here. Once one theory of jurisdiction is upheld on appeal— There's no immunity. Everything's open. That is a classic issue that could be resolved in a final order. If it turns out that that extra discovery that Your Honor is saying— which, again, I reject the principle that it's even applicable here, because Judge Boasberg said he's not ordering any of that. It doesn't happen in this case. I'm asking legal line drawing here. I would say two things. Number one, it does not reach the level of encroachment on the defendant's immunity that underlies the Niambal case. It just doesn't, because they've already been held— their basic view that what they're doing is sovereign and not commercial has been rejected. And there's ample evidence that that money came to the United States, and there's ample evidence that the Grafman and the case, which is they're benefiting from moving the money between Brazil and Cuba, was administered and managed out of Washington, D.C. So we have two very, very serious issues right off the bat of that being carried on in the United States. So for them to have to maybe defend on another theory, that's minor. That just doesn't reach the level of what this court has said you shouldn't be able to do against a sovereign. And the second reason I would say it's not a viable approach is that it completely contradicts the rule against interlocutory appeals of discovery orders. Well, we have—I mean, Niambal contradicts that general. It's just not the same rules of the game when you've got a foreign sovereign entity. Well, the Supreme Court has said that the rule cannot— that the interlocutory appeal doctrine under Cohen should not be so expansively interpreted as to swallow the rule against interlocutory— Said that in Mohawk, a case involving foreign sovereigns. Again, there's one thing about Niambal that survives here, and that is the somewhat higher level of the standard for what's relevant for discovery. That much we can see, which was you have to make a specific allegation of an issue that's directly relevant to the jurisdictional issue. And that's exactly what Judge Boasberg did. I mean, he made it very, very clear, and I can read you his order to that effect. He said, Plaintiffs have provided enough for a well-founded allegation that the commercial activity in question was carried on in the United States. And he cited the materials that we found for ourselves and put into the record, which are at pages 1163, 1165 of the JA, that the activity in question was carried on in the United States. And all Niambal requires is a specific, well-founded allegation, as opposed to mere conjecture and surmise that has not been conclusively disproven. So what are the facts that he was referring to when he said that we provided information that showed that this was carried on in the United States? We found the Executive Committee report by PAHO that says, in 2016, that PAHO had placed the project support costs from Mice Medicus, some $56 million, into the general budget, so they were being distributed across the organization. Now, how does that help? Because the U.S. brief in our prior appeal said, look, if these are program support costs, that's immune. That's not commercial activity and, therefore, immune. So how about where do they go and how they're used? How does that show they're not program support costs? Well, what PAHO's sworn declaration say is that program support costs go to pay indirect costs of the program, right? That's what their sworn declaration says. I know, but why are you cutting into the budget in the U.S. part of the indirect costs? Well, it's just not. I mean, we asked for discovery on that, and they've resisted as if they don't have to prove that. So they don't want to prove what their declaration says. But what we found does contradict the basic argument that they're making. It says that the final report from 2017, program support costs levied on all voluntary contributions were considered flexible funding, and they confirmed that Mice Medicus Project had become a significant source of such funding in recent years. They said in the audit committee report that Mice Medicus Project has continued to recover significant sums of PAHO for project support costs. Now, what we also provided, which is contrary to their declaration, is a rule that says that program support costs in the regular course of PAHO's business are intended to, in fact, flow through its Washington, D.C. headquarters. The point not mentioned by PAHO's declaration is that the policies governing PSC funds, and we cite it, and it's in the record, established that program support costs are credited to a special fund for program support costs under the control of its director who may approve a distribution of earned program support costs for, among other uses, PAHO headquarters. And in normal times, PAHO taps the special fund for program support costs to supplement its general budget. Those are the facts that Judge Boasberg cited when he said that we provided specific allegations of this money being used and that the program support costs money was carried on in the United States. I'm curious about how one does this money. I mean, money is fungible, right? I mean, I assume unless, you know, unless the money has little markings, special markings on it, there's no way of knowing because the Pan American Health Organization has lots of programs going. There's really no way of showing that the dollars that came from Brazil are the same dollars. It doesn't, well, I'm citing their records that say it's the same dollars, Judge. I'm not making this up. This is not speculation. This is PAHO's executive committee annual reports saying that the money from the MICE saying that the general budget money is used for headquarters. Well, that's what I'm asking is they even assume it went into the general budget. I'm betting a lot of other things went into the general budget, too. It's a U.S. nexus. Judge Boasberg will decide whether or not we win on jurisdiction, but we're entitled to that information. It's a general budget in the U.S.? Where is it? What bank account is that in? I, you know, they're arguing that we need the bank records to get the bank records. These are the exact records that Judge Boasberg said we're entitled to because it's relevant to our carried-on theory. And so I think we came up with a lot to contradict the statements they made in their sworn declarations. Judge Boasberg relied on to say, we've made the specific finding that NIAML requires. We did, and so now it's a question of can we refute their, all of the factual arguments they're making, including this one, by the way, that it's sovereign and not commercial. Yes, we're entitled to that discovery as well, but what Judge Boasberg was very, very narrow. Banking records, discussions about which banks they were going to use, and he narrowed that to it had to involve banks in the United States, and this question of headquarters activity. You know, when they got the case moved from Miami to Washington, Mr. Anderson, the director of administration, said that six of the nine people who can speak to the plaintiff's allegations that PAHO profited from the Mike's Medicos program and how the finances were used are located in Washington, D.C. That would be Karen. This is completely different from the other cases because the gravamen of our claim is that they... People who can speak to how money is used in the location doesn't mean that that money was used in that location. That just means where the people with knowledge are. But we're entitled to the discovery. That's all we're talking about here. That's certainly a specific enough basis for Judge Boasberg to conclude that we're entitled to the discovery about the movement of the money and the management of the program, which was all about PAHO getting 5%. One of the arguments is how much of this was used to pay Cuba and how much of it was used to pay whatever else it was used for. I mean, 90% of the money went to Cuba. So, like, what program support costs did PAHO really have here? They collected the money and they put it to work in their general budget. That's a fee. That's the argument we're going to make to Judge Boasberg. That's the fee they obtained for doing this dirty work for Cuba. And we're on very solid ground that that speaks to commercial activity carried on in the United States. I have a couple of other points I'd like to make, Your Honor, about this because... I want to make them quickly then. Well, Judge Boasberg decided that the plaintiff's allegations stated, you know, a violation of the Trafficking Victims Protection Act with a gravamen being, you know, in the United States and commercial activity with an exit to the United States. That was five years ago. This court decided its jurisdictional issue three and a half years ago. Since then, we've been fighting with PAHO over records that we believe are entitled to overcome their factual motion to dismiss. As Your Honor pointed out, they chose to bifurcate the issue of legal immunity and the factual immunity. To the extent they have to, you know, now deal with the jurisdiction, that's their choice. But for the plaintiffs who are, you know, victims of serious misconduct that the United States government has recognized as being violations of international law and U.S. law, to have to wait three and a half years to get records that the Phoenix consultant case says, you know, we're categorically entitled to, that's a great injustice. And the precedent, they're pushing on this court to be able to have, you know, one appeal after another. And when they say we're not going to appeal another one, no. If we win here, Judge Boasberg says, get the documents, and they're not happy with what he orders, and they want to contest that again under their theory, they would have an absolute right to another appeal ad infinitum. So, as the human trafficking legal center wrote in their amicus brief, 40 percent of the TVPRA cases filed since the law was amended in 2003 to provide a private right of action are still pending. PAHO does not contest basic elements of what my clients have alleged, which is that they were trafficked by Cuba to Brazil, that PAHO was aware of it, and that PAHO benefited financially from the movement of collecting $2.5 billion from Brazil and sending it to Cuba, and keeping at least $129 million for itself, for its corporate purposes. That is commercial activity carried on in the United States, and I respectfully request that the court dismiss the appeal or affirm on the merits. Any questions? All right. Thank you, counsel. All right, Mr. Volchak, we'll give you two minutes. Thank you, Your Honor. One thing Mr. Dubbin said at the very end, jumped to the very top of my list, PAHO absolutely denies that it had any awareness that there was any human trafficking or forced labor involved in MES MEDICOS. It is opposed to all of those things, and certainly would not have knowingly participated in any of it. Mr. Dubbin, I think his presentation made clear their position is, if you get one legal theory deemed to be facially viable, assuming facts to be true, you get your sexual discovery on remand on 5, 10, 25, 50, innumerable other untested, potentially unrelated theories. I submit that cannot be right. Think about how that would eviscerate IOIA and FSIA immunity, and think about- Decide that in this case, though? Yes. I submit you do, Your Honor, because we submit that much of the discovery, and we're getting the characterization, but much of the discovery, certainly at least five of the 13, six of the 13- If we disagree on that, if we think that this is all within the scope of our previous decision, then we don't have- Well, then we have a different argument about have they satisfied Neambul. But I would emphasize to the court, the district court gave only one reason for five of its 13 for ruling in favor of five of the jurisdictional discovery requests, that it was relevant to their theory of administration of MES MEDICOS. But think about the mischief that that would cause. Imagine if they had come in the first appeal and actually advanced administration of MES MEDICOS, and this court had rejected it as legally insufficient under Youngquist. Surely they would not have been able to go back and then get discovery on it. So it creates all sorts of incentives to come in with just one theory, and you don't have to look farther than this case to see that in reality. Look at the bottom of page 32 of their brief in this court in the prior appeal. They basically disavowed administration of MES MEDICOS as a theory. They said something very close to. AHO seeks to redirect this court's attention to its general administration of MES MEDICOS, but plaintiff's section 1589B claim is based, the specific activity on which it's based, is moving money for a fee. So in this court, they said, no, no, no, not administration of MES MEDICOS. That's not our theory. They go back to the district court and they get substantial jurisdictional discovery on precisely that theory that cannot be right. Your honors, I have no time left, but if the court had any questions about his, the general budget, the 5%, that's legally inviolable and factually infirm, and I would be happy to discuss why if it would assist the court. Otherwise, I ask the court to vacate and remand. Thank you. I think we've got strong arguments on both sides, and we thank counsel for their arguments and the cases submitted.
judges: Millett; Pan; Garcia